**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Timothy Dennis MORIARTY, Defendant-
Appellant.**

**No. 15814.**

United States Court of Appeals
Seventh Circuit.

April 6, 1967.

Certiorari Denied June 12, 1967.

See 87 S.Ct. 2116.

---

John J. Duffy, Lentz, Cantor, Kilgore & Duffy, West Chester, Pa., for defendant-appellant.

Alfred W. Moellering, U. S. Atty., Joseph F. Eichhorn, Asst. U. S. Atty., Fort Wayne, Ind., Kenneth P. Fedder, Asst. U. S. Atty., South Bend, Ind., for appellee.

Before SCHNACKENBERG, KNOCH, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Timothy Dennis Moriarty was indicted for bank robbery in violation of 18 U.S.C. § 2113(a). After a jury found him guilty, he was sentenced to imprisonment for ten years. The defendant appeals from his conviction, claiming that the district court erred in admitting a confession into evidence and that he was deprived of a fair trial because of prejudicial remarks by Government counsel during summation to the jury.

The confession in issue is contained in a written statement signed by the defendant and made in the presence of two special agents of the Federal Bureau of Investigation. The district court ruled the confession admissible after conducting an evidentiary hearing out of the jury's presence. The FBI agents, the defendant, his lawyer, and the deputy warden of the Chester County prison, West Chester, Pennsylvania testified. Many of the facts were in dispute. The district judge in the main credited the testimony of the FBI agents. Following is a summary of the evidence submitted at the hearing.

On March 19, 1965, the Trail Creek Branch of the Citizens Bank, Michigan City, Indiana was robbed by two men. The defendant thereafter became a suspect. On April 1, 1965, FBI special agent J. Clifford Ousley went to the defendant's home in Malvern, Pennsylvania and inquired as to the defendant's whereabouts. The following day, the defendant's sister gave agent Ousley the telephone number of the defendant's attorney, John J. Duffy. Upon calling Duffy, the agent was told that Duffy was representing the defendant in a state criminal case and that the defendant was in Duffy's office at that time. The agent was admonished not to talk to the defendant unless Duffy was present.

On April 23, 1965, the defendant entered a plea of guilty in the Criminal Court of Chester County, Pennsylvania to charges of burglary and larceny. He received an indeterminate sentence of from nine to twenty-three months, which he began serving in the county prison.

On May 19, 1965, agent Ousley and special agent Gentry H. Lowe, Jr. went to the prison to interview the defendant. The defendant testified that after the agents identified themselves, he told the agents he could not talk with them unless his attorney, Duffy, was present. The agents testified that the defendant first told them he had discharged Duffy. They further testified that the defendant was told at the start of the interview that he could remain silent, that anything he said could be used against him in court, and that he could consult an attorney before going ahead with the interview. The agents stated that when the defendant said he had no objection to talking to them, they proceeded with the interrogation. Agent Ousley testified, however, that at one point, when the questioning focused upon Chicago and Michigan City in February 1965, the defendant stated he didn't want to talk about that unless his attorney was present. Ousley stated that he immediately changed the subject of conversation.[1]

---

1. Agent Ousley's testimony on cross-examination appears as follows:

Q. Isn't it true Moriarty on more than one occasion told you he did not desire to discuss the investigation any further in the absence of his lawyer?

A. No. The only thing he said in that connection, the first time I was interviewing him I asked him about Michigan City, about whether he had been in that city, and at one point in the interview he said he did not wish to dis-

During the interview the defendant denied having committed the robbery, but he consented to be fingerprinted and agreed to appear in a line-up at a future date.

On June 14, 1965, two tellers from the Michigan City bank and a customer who was in the bank during the robbery appeared at the prison with agents Ousley and Lowe. The defendant, having learned that he was to appear in a line-up, refused to participate. But when the defendant left the identification room where he had been taken and started to return to his cell, he was seen by the prospective witnesses, who were standing behind a large window in the prison control room, located directly across the hall from the identification room. The defendant realized the situation and threw his arms up to hide his face. Later that day the defendant talked to the deputy warden of the prison, registering a complaint that his rights had been violated. At the defendant's request, the deputy warden attempted to call Duffy, but learned that the latter was confined to a hospital.

Two days later, on June 16, agent Lowe was at the prison on another matter when he received word that the defendant wanted to talk to him in the deputy warden's office. The agent testified:

I looked at Timmy who was sitting in a chair in the deputy warden's office and I said, "Timmy, you know who I am; you know you don't have to tell me anything; and anything you say can be used against you in a court of law, and I can't make any promises to you. At that point he told me, he said, "Well, I did it. I robbed the bank." He said, "I thought you fellows were bluffing until I saw the witnesses." And then he said he knew we were not bluffing.[2]

The defendant then made an oral statement confessing the robbery and, after agent Ousley was called to the prison, the defendant signed a written statement to the same effect prepared by agent Lowe. The first paragraph of the statement recites in part:

I have been advised that I do not have to make a statement and that anything I say can be used against me in a court of law. I have been advised of my right to consult an attorney before making a statement. I have been advised that if I cannot afford an attorney the Federal District judge will appoint one for me. No threats or promises have been made to me.

During his testimony, the defendant denied that he was informed of his rights and stated that he unsuccessfully requested the opportunity to have attorney Duffy present when the statement was given. The defendant stated that the agents made a "deal" with him, that they guaranteed him either a sentence running concurrently with his state sentence or probation. He testified that after the statement was written, he complained to the agents that it contained nothing about the "deal." According to the defendant, agent Ousley replied, "It only makes sense, we can't put anything like that in a statement. If the judge looked at it what would the judge think? And suppose the papers get hold of it, what would the public think?" Agent Lowe denied that any promises were made to the defendant.

The defendant says the totality of circumstances just summarized demonstrates that his confession was the result of psychological coercion and therefore inadmissible. He also attacks the admissibility of the confession on the

cuss being in Michigan City; unless his attorney was present he did not wish to discuss it.
Q. That was during the interview of May 19th?
A. Yes. And we terminated our conversation about Michigan City and

started talking about him being in New York and San Juan.

2. Agent Lowe also testified that at the start of the interview he informed the defendant of his right to consult an attorney.

ground that he was denied the right to the assistance of counsel, citing Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and contends that as a result of this infirmity his fifth amendment privilege not to be compelled to incriminate himself was violated, citing Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[3]

■ The defendant urges us to consider the "promises" made by the FBI agents and the defendant's unanswered requests for the assistance of his attorney together with the fact of his confinement in prison in determining whether his confession was voluntary. The defendant's testimony concerning promises of assistance was discredited, however, as was his testimony regarding a request for counsel prior to making the statement on June 16. The defendant's incarceration was fortuitous to the investigation. Even though it is a relevant circumstance in an inquiry as to psychological coercion, confinement itself is not sufficient to render a confession involuntary. The defendant was not subjected to prolonged or persistent questioning. No tricks or cajoleries were practiced and no evidence of abnormal or unusual psychological pressures upon the defendant appears in the record.

As to whether the defendant knowingly and intelligently waived his right to counsel before making the statement challenged, the conflicts in the testimony were again resolved against him. According to the FBI agents, the defendant was given repeated warnings that he could remain silent, that he could consult with an attorney before he said anything, and that if he said anything it could be used against him in court. The defendant denied having received any warnings. The district judge credited

the agents' testimony. Moreover, the defendant possessed more than a passing acquaintance with his constitutional rights. By his own admission, he overheard his attorney tell the agents that the defendant was not to communicate with the FBI out of his attorney's presence. The decision to disregard attorney Duffy's advice could, of course, be voluntarily made by the defendant; it was the defendant's decision to make.

■ Even if it be conceded that the agents disregarded attorney Duffy's admonition by interrogating the defendant on May 19, and also admitting that the agents sidestepped a request by the defendant to consult with Duffy during the interview on that date, the important question is what relation these circumstances bore to the waiver of the defendant's right to counsel and the voluntariness of the defendant's confession on June 16. There must be a nexus between any overreaching by the agents and the defendant's confession to render the confession involuntary. Here that nexus is missing. The questioning on May 19 did not result in the confession. The defendant volunteered the statement one month later, presumably conscious of his attorney's advice, and after having been fully advised of his right not to make a statement and of his right to counsel. Further, the record indicates that it was the aborted lineup on June 14 that precipitated the defendant's decision to make the statement, not any undue pressure exerted by the agents in questioning him earlier. In this respect the defendant commented, significantly, that after seeing the prospective witnesses from Michigan City he no longer believed the agents were "bluffing." We hold that the defendant intelligently waived his right to counsel and voluntarily gave his confession. The confession was therefore admissible.[4]

---

3. The defendant was convicted approximately three months before Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), was decided.

4. The defendant also contends that his confession was obtained in violation of the

"spirit," if not the letter, of Rule 5(a) of the Federal Rules of Criminal Procedure. Rule 5(a), which requires an officer making an arrest under a warrant to bring the arrested person before the nearest available commissioner "without unnecessary delay," has no applica-

The defendant contends that a fair trial was not afforded him because of certain remarks by Government counsel during summation. In referring to the defendant's written confession, the prosecutor stated:

> Mr. Duffy would have you believe that the confession is not in evidence, but I say to you there is a confession in evidence. It is a confession voluntarily given after being fully advised of his rights. The law states if it is involuntary it is not admissible into evidence, and this statement was admitted into evidence by the court.[5]

Following closing argument, the defendant objected to this statement on the ground that it was a misquotation of the law, that the jury had the right to determine the voluntariness of the confession. The district judge agreed and said he would inform the jury that "counsel has misinterpreted the law" and that the jury "must take the law from the court." Later, in his instructions, the judge properly submitted the question of voluntariness to the jury. The jury was instructed that the confession should be disregarded unless the jury found it was "freely and voluntarily" made.[6] The jury was also told that if counsel had inadvertently misstated the law, the jury should follow the law contained in the court's instructions. Thus, even though the prosecutor's comment improperly suggested that the voluntariness of the defendant's confession was not open to the jury's consideration, we have no reason to believe the remark was other than inadvertent, and the court's instructions cured whatever error occurred.

The judgment is affirmed.

---

tion to this case. The defendant had not been arrested on a federal charge nor was he in federal custody when he was questioned by the FBI agents. The assumption that, had the defendant not been serving a state sentence, the agents may have had probable cause upon which to secure a warrant for the defendant's arrest prior to questioning him is irrelevant. It follows, of course, that the McNabb-Mallory doctrine, McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), is also inapplicable.

5. The inaccurate statement by defense counsel during his final argument which apparently prompted the misleading remark by the Government prosecutor is as follows: "[W]e are here on a clear case of considering whether or not this confession is in evidence * * * so when you deliberate I think you should address yourselves first to the question of admissibility of the confession."

6. The court's instruction reads:
Evidence has been introduced that defendant made a confession relating to the crime charged in the indictment. The jury must weigh any confession with caution, and scrutinize the circumstances surrounding it to determine whether it was freely and voluntarily made. If the jury finds that such confession was made freely and voluntarily by the defendant with knowledge of the nature of the confession, and without fear or coercion, either physical or psychological, or promise of reward, the jury may consider it together with all the other evidence in determining the innocence or guilt of the defendant. However, if the jury finds that the confession was not made freely and voluntarily by the defendant, the jury should disregard it entirely.