THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GREGORY VINSON *et al.*, Defendants-Appellants.

First District (1st Division)    No. 61156

Opinion filed May 23, 1977.

James J. Doherty, Public Defender, of Chicago (Leonard V. Solomon, Assistant. Public Defender, of counsel), for appellant James Chapman.

Leo I. Fox, of Chicago, for appellant Gregory Vinson.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Mary Ellen Dienes, and Paul E. Kelly, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendants, Gregory Vinson and James Chapman, were jointly charged by indictment with the murder of Virgil White in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1969, ch. 38, par. 9—1). After a bench trial, defendants were convicted of murder and

sentenced to 60 to 80 years in the penitentiary. Both defendants appeal. Both contend that the trial court improperly admitted hearsay evidence. Chapman also argues that the State did not prove that he was accountable for the murder of White and Vinson contends that the trial court improperly denied his motion for a severance.

Annie Crump, Virgil White's aunt, testified that the decedent was in good health on October 9, 1971. She identified his body in the morgue on October 21, 1971.

Mildred Flenory, decedent's mother, testified that she gave two of the decedent's notebooks in which she had seen him write to Investigator Hollins. Virgil White carried a small address book in his pocket.

Chicago Police Officer Thomas Nolan testified that on October 16, 1971, at about 5:15 a.m., while on patrol with Officer James Tyrcha, they received a radio dispatch that a man was shot around the Ryerson School at Ohio Street and Springfield Avenue. They proceeded to the school and began a search. They heard a groaning from near one of the mobile units, where they found Virgil White lying in a pool of blood. Tyrcha asked the man how he felt. White said he was feeling no pain. White told Tyrcha that Greg Vinson and Chap Dog had shot him. He said that Vinson and Chap Dog were members of the Souls. Tyrcha asked White who the Souls were and White responded that they were a street gang. Nolan found a shotgun shell about 20 feet from White's body. At the end of White's right arm an address book was lying open in the pool of blood. On the open page "Greg Vinson and Chap Dog kill me" was written.

On cross-examination, Nolan said he did not ask White whether he had written that statement in the book. White had not said he had written it. "Gree Vincent," not Greg Vinson, was written on the open page. There was no other blood except the pool around White. White told Tyrcha about Vinson and Chap Dog without being asked what happened. Nolan had found a blood-covered pen about 10 feet from the victim, but did not know where it now was.

Chicago Police Officer James Tyrcha, Nolan's partner, testified that on October 16, 1971, at the Ryerson School they found a man, later identified as Virgil White, lying in a pool of blood a few feet from one of the mobile units. Tyrcha asked the man how he felt. He replied, "I don't feel nothing. I don't feel nothing at all." Immediately after that, White said, "I was shot by Chap Dog and Greg Vinson." He then said something about gangs and the Souls. There was a small address book near White's hand. Nolan found a pen near White.

When cross-examined, Tyrcha said he had only asked the victim how he felt before the victim told him what had happened.

Percy Hollins testified that on October 16, 1971, he was an investigator for the Chicago Police Department, assigned to Area 4 Homicide. At

Garfield Park Hospital on that morning, a man he recognized as Virgil White was brought into the hospital. After White had been with the medical personnel, Hollins asked White what happened and who did it. White responded that Greg Vinson and Chap Dog had shot him. Investigator Hollins knew James Chapman as Chap Dog. Later that morning, Hollins and Officer Robert Wasmund went to James Chapman's house. He talked to Chapman's parents and then to defendant Chapman. He advised Chapman of his *Miranda* rights and defendant said he would talk. Hollins testified to Chapman's statement:

> "A. He stated that he and Virgil White and another fellow were walking through the school yard discussing an incident that had happened earlier; that Virgil White had got ahead of him and the other fellow; that the other fellow asked him for a shotgun which he carried under his coat and told him to look out for the police, and that the other fellow fired the shot, striking Virgil White, and that the [*sic*] ran from the playground to a house in the 500 block on Monticello where they took the shotgun."

Chapman made no further statement then. Mrs. Flenory had given him two of the decedent's notebooks, which he took to the Chicago Police Department Crime Laboratory to be analyzed along with the address book found by White's body.

On cross-examination, Hollins said that White had told him that King Greg had shot him. Hollins knew of no other Greg in that neighborhood than Vinson.

Chicago Police Officer Robert Wasmund, Hollins' partner, testified that Chapman was taken to Area 4 headquarters, where he was questioned by Wasmund and Hollins after again being informed of his *Miranda* rights. Chapman said that after shooting White he and the other fellow fled to the home of Tony Beck. They gave Tony Beck the shotgun.

Investigator Thomas Sherry testified that on the morning of October 16, 1971, he and Investigator Griffin accompanied a Tony Beck to a building in the 500 block of North Monticello in Chicago. On the roof of that building Sherry found a sawed-off Stephens Savage 820-B .12-gauge shotgun and an expended shotgun shell.

Investigator James Griffin testified that he delivered the shotgun that Sherry found on the roof of that building to Sergeant Donald Smith of the Chicago Police Department Crime Laboratory.

Sergeant Donald Smith, a qualified firearms identification technician for the Chicago Police Department Crime Laboratory, testified that he conducted a test on the expended shell found in the Ryerson School yard and tests on the expended shell and the shotgun found by Investigator Sherry. An examination and test-firing of the shotgun and his examination of the known and unknown shells led Smith to conclude that the known

and submitted shells all were fired from the shotgun which Griffin had submitted.

The parties stipulated that if Doctor Jerry Kearns, a qualified and experienced pathologist, was called to testify he would state that the cause of Virgil White's death was the shotgun wound to decedent's back which caused a destruction of the spinal cord, fracture of the cervical vertebrae and extensive laceration of the middle and lower lobes of the right lung. The parties also stipulated that if Maureen Casey, a qualified and experienced examiner of questioned documents for the Chicago Police Department Crime Laboratory, was called to testify she would state that in her expert opinion the person who executed the hand printing in the address book found by White's body was the same person who executed the hand printing in the decedent's notebooks received from Mrs. Flenory by Investigator Hollins.

Walter Chapman and Minnie Chapman, the parents of James Chapman, testified in his behalf. They stated that their son made no statement to the police officers who questioned him at their home on October 16, 1971.

Defendants argue that the trial court improperly admitted into evidence the victim's three statements: the writing in his address book found under his hand when he was discovered by the police; his statement to Officer Tyrcha in the schoolyard; and his statement to Investigator Hollins in the hospital emergency room. The trial court admitted all of the victim's statements as spontaneous declarations after a lengthy hearing on defendants' motion *in limine*.

■■■ The three criteria for a hearsay statement to be admitted as a spontaneous declaration are (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence. *People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804, 807; *People v. Sullivan* (1977), 48 Ill. App. 3d 555, 362 N.E.2d 1313.

Applying these criteria to the first two statements, we find that the occurrence was sufficiently startling to meet the first criterion for admissibility. (See *People v. Leyva* (1977), 47 Ill. App. 3d 53, 361 N.E.2d 763; *People v. Robinson* (1977), 47 Ill. App. 3d 48, 361 N.E.2d 759.) With reference to the second criterion, although the exact time of the shooting does not appear of record, time itself does not control the admissibility of the declaration. (*Poland; People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310.) The critical factor is the lack of opportunity to fabricate. (*Parisie.*) The trial court was justified in concluding that the writing in the victim's address book and his statement to Officer Tyrcha were not the products of calculation, fabrication or design. (See *Leyva; People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180; *Parisie.*) Finally,

the statements do relate to the circumstances of the occurrence. On this record we cannot say that the trial court erred in admitting those two statements as spontaneous declarations.

■■ As to the third statement, even if it did not meet all three criteria, its admission was harmless beyond a reasonable doubt because it was merely cumulative.

■■ Defendant Chapman also argues that the State did not prove that he was accountable for White's murder. After reviewing the record, we cannot say that a reasonable doubt of guilt is established by the record. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; see *People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied*, 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305; *People v. Martin* (1977), 46 Ill. App. 3d 943, 361 N.E.2d 595; *People v. Jones* (1973), 11 Ill. App. 3d 450, 297 N.E.2d 178.

■■ Defendant Vinson also contends that the trial court improperly denied his motion for severance because Chapman's defense was antagonistic to him and Chapman's statement was introduced against him. Generally, co-defendants are tried jointly unless their defenses are so antagonistic that a severance is required to assure the defendants a fair trial. (*People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326.) A motion for severance is addressed to the sound discretion of the trial court. (*People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied*, 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) Neither defendant testified in this case. In fact, the only defense testimony was that of Chapman's parents that he made no admission to the police in their presence. From the record before us, it is apparent that the defendants' defenses were not antagonistic. The trial court did not abuse its discretion in denying a severance on the ground of antagonistic defenses.

Vinson also contends that the trial court should have granted his motion for severance because the trial court considered Chapman's statement as evidence against him. Defendant's contention is devoid of merit. There is no indication in the record that the trial court considered Chapman's statement against Vinson. Indeed, the trial court required that Vinson's name be deleted from Chapman's statement and stated it would not consider that statement against Vinson. We must presume that the trial court, sitting as the trier of fact, considered only competent evidence in reaching its verdict. (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Earl* (1966), 34 Ill. 2d 11, 213 N.E.2d 556; *People v. Simms* (1973), 14 Ill. App. 3d 667, 303 N.E.2d 169 (abstract).) Nothing in the record rebuts that presumption.

■■ Defendant Vinson incorrectly relies on *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, to support his position. There the court held that a co-defendant's confession was not

admissible against a defendant in a jury trial. (391 U.S. 123, 126, 20 L. Ed. 476, 479, 88 S. Ct. 1620.) Nothing in *Bruton* suggests that in a bench trial a judge's statement that he will not consider a co-defendant's confession against the other defendant is to be disregarded, particularly where the record does not show that despite his statement he did so consider it. (*Cockrell v. Oberhauser* (9th Cir. 1969), 413 F.2d 256, *cert. denied*, 397 U.S. 994, 25 L. Ed. 2d 401, 90 S. Ct. 1130; See *Simms.*) The trial court did not abuse its discretion in denying a severance on the grounds of prejudice to defendant from the admission of his co-defendant's confession.

The convictions of defendants Vinson and Chapman are affirmed.

Affirmed.

GOLDBERG, P. J., and BUA, J., concur.